**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **:** |
| **v.** | **:**   **CRIMINAL NO.  15-248-1, 2** |
| **TREVOR SUMMERS** | **:** |
| **JONATHAN SNYDER** | |

### GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, by its attorneys, Zane David Memeger, United States Attorney for

for the Eastern District of Pennsylvania the Eastern District of Pennsylvania, and Linwood C. Wright, Jr.,

Assistant United States Attorney for the District, hereby submits its trial memorandum in the above-

captioned case.

### I.  BACKGROUND

On June 11, 2015, a federal grand jury sitting in the Eastern District of Pennsylvania returned a

three count indictment charging defendants Trevor Summers and Jonathan Snyder with conspiracy, in

violation of 18 U.S.C. § 371, and three counts of wire fraud and aiding and abetting, in violation of 18

U.S.C. §§ 1343 and 2.   On November 19, 2015, the same federal grand jury returned a superseding

indictment charging defendants Trevor Summers and Jonathan Snyder with four counts of wire fraud and

aiding and abetting, in violation of 18 U.S.C. §§ 1343 and 2.  On February 11, 2016, this same grand jury

returned a second superseding indictment which included two additional counts of wire fraud and aiding

and abetting.

### II. ELEMENTS OF THE OFFENSE

**A.**      **18 U.S.C. § 1343 (Wire Fraud).**

Title 18, United States Code, Section 1343 provides that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

To establish a violation of Section 1343, the government must prove the following elements beyond a reasonable doubt:

(1)     That the defendant devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature);

(2)     That the defendant acted with the intent to defraud; and

(3)     That in advancing, furthering, or carrying out the scheme, the defendant transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce.

**B.     18 U.S.C. § 2 (Aiding and Abetting).**

In order for the defendant to be found guilty of aiding and abetting wire fraud, the government must prove beyond a reasonable doubt that:

(1)     the defendant knew that the crime charged was to be committed or was being committed;

(2)     the defendant knowingly did some act for the purpose of aiding the commission of that crime; and

(3)     the defendant acted with the intention of causing the crime charged to be committed.

"The general rule is that in order to convict a defendant of aiding and abetting the commission of a substantive offense, the proof must establish that the crime in question was committed by someone and that the person charged as an aider and abettor, aided and abetted in its commission.  It is not a prerequisite to the conviction of the aider and abettor that the principal be tried and convicted or in fact even be identified." *United States v. Wasserman*, 418 F.3d 225, 233 (3d Cir. 2005).

III. <u>FACTS</u>

At trial the government intends to prove the following facts, among others, through a combination of witnesses and documents.

A. **<u>Background of the Defendants and Their Companies.</u>**

Defendants Trevor Summers and Jonathan Snyder were co-founders of the companies StrawAds, Inc. ("StrawAds") and Resound, LLC ("Resound"). Summers was a landscaper. Snyder, who had a degree in marketing and advertising, operated an internet web-design company called Matrix Design from his Newtown Square home.

In or about March 2010 Summers and Snyder formed StrawAds. Incorporation records for Resound show an incorporation date of September 2007. Summers and Snyder each owned 40% of Resound. They each owned 50% of StrawAds.

According to their business plan, Resound would develop the process of printing food-grade advertisements on drinking straws, hold the patents for the process, and collect royalties from the use of the patents. Investors in Resound would be paid dividends from the royalties. StawAds would produce the drinking straws with advertisements. Investors in StrawAds would be paid royalties from the sales of the straws. Snyder was in charge of marketing, while Summers was in charge of sales and investor relations. They employed a sales and support staff and eventually rented considerable office space in Media, Pennsylvania.

B. **<u>False Statements to Investors, Lenders, Employees and Others.</u>**

In 2010, Snyder and Summers began soliciting investments in the two companies. They prepared various documents, and began holding pitch meetings and distributing the documents to investors and others. Snyder and Summers told potential investors, lenders, employees and others, among other things, that they had patented the process for printing advertisements on drinking straws. They also said that Resound owned the patents but licensed the patents to

StrawAds, the company that actually sold services to clients and did the printing.  StrawAds then paid Resound a licensing/royalty fee.

Snyder and Summers successfully solicited investments and loans, totaling in excess of $400,000. For the purpose of inducing investment, loans and sales, the men told investors, lenders, employees and others, variations of various lies including, but not limited to: (1) Resound owned patents; (2) StrawAds owned machinery in China; and (3) StrawAds had substantial sales.

### 1.   Resound Held No Patents.

Beginning in September 2010, Snyder and Summers told various investors that Resound held patents for the process used to print advertisements on drinking straws, and for the food-grade non-toxic ink used to print the ads.  A private placement memorandum that was given to potential investors stated that they had obtained "FDA approvals and patent and Intellectual Property rights for both this new form of business, as well as the FDA printing process that enable the application of a food-safe message on a straw."  This document also stated that StrawAds had "invoiced $1,800,000+ in orders."

Based on, among other things, these statements John Coneys, one of the larger victims of the fraud, invested $110,000 in Resound after a pitch meeting at the StrawAds offices in Media. Summers and Snyder, who spoke equally during the meeting, told Coneys that StrawAds had $1,000,000 in sales, and provided him an "Offering Memorandum" that stated "Resound, LLC, through its managers, has patented the process in which food grade contact substances can be applied to drinking straws for distribution in business."  On September 21, 2010, Summers emailed Coneys with the wiring instructions for the investment.  Coneys wired $110,000 into the

Resound TD Bank account.  The patents were one of the main reasons Coneys invested in Resound, because in his view, without the patents, Resound was worthless.

Within a month of making this investment, Summers and Snyder asked Coneys to invest more money, and Coneys got suspicious.  Coneys hired forensic accountant Robert Birtch to examine StrawAds and Resounds financial records.  The forensic accountant told Coneys not to invest in the company.  In mid-2011, Snyder and Summers again asked Coneys to invest additional funds.  At this point, Coneys hired a patent lawyer to assess the intellectual property held by the companies.  The lawyer determined that the companies held no patents.

In addition to Coneys, Summers and Snyder told numerous others, including investors, employees and lenders, that they held patents.  Bob McCray, a Georgia business man, invested after a meeting with Summers and Snyder and being told Resound held the patents for printing advertisements on drinking straws.  McCray relied on the representations concerning the patents, the ownership of four machines, and a purported sales contract with Public Storage in making his decision to invest.  On October 25, 2010, Summers emailed McCary the wiring instructions for the investment. On October 26, 2010, McCray wired $50,000 to Bryn Mawr Trust.

Following his investment, in November 2010, McCray emailed Summers with additional questions concerning the companies.  McCray requested both the patent numbers and clarification as to whether the patents were "for manufacturing the straws or for the process of putting the images on the straws or a combination of both?"  Summers responded via email on November 10, 2010, stating that the patents were for "both" processes, and provided patent numbers "61/312,706 and 61/314,484."  Records received from the U.S. Patent Office show that application number 61/312,706 was for a provisional patent only, and that expired on March 13, 2011.  The Patent Office also stated that the second number provided by Summers in the email,

61/314,484, "was not applied for by Trevor Summers, Jonathan Snyder, or the companies StrawAds or Resound, and it was not directed to methods or apparatus for printing advertisements on drinking straws."

In fact, as the Patent Office confirmed, Summers and Snyder never held patents for anything. They only had what are called "provisional patents," but had never completed the process. The provisional patent only lasted one year and was merely a "book mark" to start the patent process.  To obtain the actual patents was an expensive and time consuming process. Neither Summers nor Snyder, both of whom knew the difference between a provisional patent and a patent, sought a patent.

### 2.  Summers and Snyder Never Owned Machinery.

Snyder and Summers also told various investors, lenders, employees and others including Bob McCray, that the company owned the machines that were used to print the straws.  McCray relied on Summers' statements concerning ownership of the machines when deciding whether or not to invest in the companies.  In Summers' email to McCray on November 10, 2010, which is discussed above, Summers also stated that "StrawAds owns the current 4 overseas units and will own all additional units."  Raymond Chin, a consultant who set up a contract between StrawAds and a Chinese company that owned the machinery to print ads on straws, confirmed that this statement was false.

### 3.  StrawAds Had Minimal Sales and Distributed Fake Contracts.

Snyder and Summers told investors, lenders employees and others, that StrawAds had significant sales, including a $1.8 million contract with Public Storage.  Krissy Flynn, who began working in StrawAds sales force in March 2010, was told by Snyder and Summers that the company had over $1,000,000 in sales because it had closed a large contract with a nationwide

storage company, Public Storage.  Flynn was provided a spreadsheet indicating that StrawAds had closed this deal (and many others with large companies, including Price Waterhouse Coopers, Merck, and the Four Seasons).  Later while working at the company, Summers told Flynn that StrawAds had just completed a deal with the entertainer Taylor Swift to make straws for her concerts. Flynn and others subsequently found out that StrawAds had minimal sales. As a result of the false representations that had been made by Summers and Snyder, Flynn and her boyfriend, Tom Farrell, invested in Resound. Later, when Flynn began to question the legitimacy of her investment, both Summers and Snyder by e-mail, in response to Flynn's e-mail, in essence assured her that everything was aboveboard and fine.

Shortly after the initial investments, Summers contacted investor Bob McCray to request additional funding for a short term loan to cover rent.  Summers assured McCray that there was a lucrative deal with Taylor Swift, and that he could pay McCray back shortly for the loan. McCray obtained $15,000 from friend Patrick Dillon, who wired the money directly to Summers. McCray subsequently received a call from Steve Gall, a car salesman hired by Summers and Snyder as a sales manager.  Gall told McCray that Summers had been lying about the Taylor Swift deal.  McCray confirmed this through speaking with Kenny Holloway, who was supposed to be Summers' connection to Swift.  Holloway told McCray that, while he previously had worked for Swift's team, he had never spoken to her management team concerning straws. When McCray confronted Summers with what Holloway had said, Summers claimed to have a direct connection to the Swift camp with a music studio in Los Angeles.

## III. OUTSTANDING ISSUES

The government anticipates that known outstanding issues will be resolved by the Court after the scheduled February 18, 2016 hearing. To the extent that during its preparation for trial

7

in this case the government recognizes additional issues, it will bring those issues to the attention

of the Court.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


*/s/Linwood C. Wright, Jr.*
LINWOOD C. WRIGHT, JR.
Assistant United States Attorney

8

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Government's Trial Memorandum was filed electronically on the Electronic Case Filing system, is available for viewing and downloading from the ECF system, and/or was served on defense counsel as follows:

Hope C. Lefeber, Esquire
Hope C. Lefeber, LLC
1500 John F. Kennedy Boulevard, Suite 1205
Two Penn Center
Philadelphia, PA 19102-1751
hopelefeber@comcast.net
**Counsel for Defendant Trevor Summers**

Mark T. Wilson, Esquire
Defender Association of Philadelphia
Federal Court Division
The Curtis Center Building
601 Walnut Street, Suite 540 West
Independence Square West
Philadelphia, PA 19106
mark_wilson@fd.org
**Counsel for Defendant Jonathan Snyder**

/s/*Linwood C. Wright, Jr.*
LINWOOD C. WRIGHT, JR.
Assistant United States Attorney

Dated: February 16, 2016

9